**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**


**THOMAS J. BERENGUER, M.D.**

       **Plaintiff,**

       **v.**                            **Case No. 2:06cv190**

**LINCOLN NATIONAL LIFE
INSURANCE COMPANY,**

       **Defendant.**

## ORDER AND OPINION

This action was brought by an obstetrician/gynecologist ("OB/GYN") seeking total disability benefits under his insurance policy. The matter comes before the Court after a bench trial on Plaintiff Thomas J. Berenguer's ("Berenguer's" or "Plaintiff's") assertions that an arthritic condition in his right thumb renders him unable to perform the substantial and material duties of his occupation, and that Defendant Lincoln National Life Insurance Company ("Lincoln National" or "Defendant") is in breach of contract for denying him total disability benefits. Plaintiff seeks damages and declaratory relief. For the reasons stated herein, the Court **FINDS** that Plaintiff's condition does not preclude him from performing the substantial and material duties of his occupation, and, therefore, he is not totally disabled. Rather, the Court **FINDS** that Plaintiff is partially disabled and that Defendant did not breach its contract.

### I.  PROCEDURAL BACKGROUND

#### A.  Parties

Plaintiff was an OB/GYN in Norfolk, Virginia. Defendant is an insurance company with

1

its principal place of business in Fort Wayne, Indiana.  In 1999, Metropolitan Life Insurance

Company ("MetLife") became the administrative agent of the disability income insurance

business of Lincoln National and thereafter was responsible for evaluating Berenguer's claims

and paying any benefits.  Id. ML 260.  MetLife is synonymous with Lincoln National for the

purposes of this opinion and order.

### B.    Procedural History

On March 10, 2006, Berenguer filed this suit in the Circuit Court for the City of Norfolk.

Defendant removed the case to this Court on April 4, 2006, because the matter fell within the

diversity jurisdiction of the federal courts.  See 28 U.S.C. §§ 1332, 1441, 1446 (2000).  This

Court held a bench trial from September 20, 2006, through September 28, 2006.  The parties

presented oral arguments to the Court and, pursuant to the Court's order, submitted Proposed

Findings of Fact and Conclusions of Law.[1]

### C.    Issues

Berenguer's Complaint (1) seeks a declaration, pursuant to the Declaratory Judgment

Act, 28 U.S.C. § 2201(a),[2] of his rights under his insurance policy and affirmation of his position

that he totally disabled, (2) alleges that Lincoln National is in breach of contract by denying him

---

[1]The parties submitted Proposed Findings of Fact and Conclusions of Law before trial
and at the conclusion of trial, both of which were considered by the Court.

[2]The federal declaratory judgment statute, 28 U.S.C. § 2201(a) provides:

In a case of actual controversy within its jurisdiction . . . , any court of the United States,
upon the filing of an appropriate pleading, may declare the rights and other legal relations
of any interested party seeking such declaration, whether or not further relief is or could
be sought.  Any such declaration shall have the force and effect of a final judgment or
decree and shall be reviewable as such.

total disability benefits, and (3) requests attorneys' fees under Va. Code Ann. § 38.2-209(A) on grounds that Lincoln National's denial of total disability benefits was in bad faith.

The issues on Plaintiff's breach of contract and declaratory relief claims, as set forth by Plaintiff in the Final Pretrial Order entered September 8, 2006, are as follows:

1.  Is Berenguer "totally disabled" under the terms of the Policy?

2.  If Berenguer is only "partially disabled," as MetLife (Lincoln National) claims, what is the extent of his partial disability?

3.  What benefits does MetLife (Lincoln National) owe Berenguer under the Policy?

4.  What damages has Berenguer suffered as a result of MetLife's (Lincoln National's) breach of contract?

The triable issues as to the breach of contract and declaratory judgment claims, as set forth by the defendant in the Final Pretrial Order, are:

1.  Whether under Count I of the Complaint Plaintiff is not entitled to a declaratory judgment that he qualifies for Total Disability benefits under the Policy.

2.  Whether Defendant properly determined that Plaintiff is residually disabled under the terms of the Policy, and not totally disabled, and therefore did not commit a breach of contract, as alleged in Count II of Plaintiff's Complaint.

The triable issues as to Count III, Plaintiff's request for attorneys' fees, can be summarized as follows:

1.  Did Defendant (MetLife) deny Berenguer's claim for total disability without making a reasonable, good faith investigation of the facts and circumstances underlying the claim?

3

## II.     FINDINGS OF FACT

The Court **FINDS** the following facts:

1.      Berenguer is not totally disabled under the Policy.

2.      Berenguer is partially disabled and his disability precludes him from performing only thirty percent of the gross charges of his practice.

3.      Lincoln National (MetLife) owes Berenguer thirty percent disability benefits in accordance with the Residual Disability clause of the Policy, which they have been paying.

4.      Lincoln National did not breach its contract with Berenguer and consequently Berenguer has suffered no damages.

5.      The defendant (MetLife) properly determined that Berenguer is residually disabled under the terms of the Policy.

6.      The defendant's (MetLife's) denial of Berenguer's total disability claim followed a reasonable, good faith investigation of the facts and circumstances underlying the claim.

### A.     The Insurance Policy

Berenguer, who is now 62, practiced medicine in Norfolk as an OB/GYN from 1975 until 2004, at all material times as a solo practitioner under the business name Women's Health Care of Tidewater.  On December 1, 1994, Berenguer, as a solo practitioner, purchased a disability income insurance policy ("the Policy") from Lincoln National.  Def. Ex. 1, ML 3.  A "Residual Disability Benefit Rider" was added as an amendment to the Policy.  Id. ML 22-23.

The Policy as amended provides benefits for "Total Disability" resulting from "injury or

4

sickness." Id. ML 4, 22. The Policy defines "Total Disability" as follows:

> "Total Disability" means that due to Injury or Sickness:
> a. You are unable to perform the substantial and material duties of Your Occupation; and
> b. You are under a Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to you.

Id. ML 22. For total disability "due to injury," Berenguer's Policy provides him lifetime benefits of $14,180 per month. For total disability "due to sickness," the monthly benefit beginning at age 60 but before 61 was $13,500 per month until age sixty-five, and $6,750 per month thereafter. Id. ML 4.[3]

The Policy also provides coverage for "Residual Disability" starting before age 65. It defines "Residual Disability" as follows:

> "Residual Disability" during the Elimination Period,[4] means that due to Injury or Sickness
>
> a) You are either:
>    1) unable to perform one or more of the substantial and material duties of Your Occupation; or
>    2) unable to perform the substantial and material duties of Your occupation for more than 80% of the time normally required to perform them; and
>
> b) You are under a Physician's Care. We will waive this

---

[3]Berenguer's original policy provided for monthly total disability benefits of $13,500; the parties stipulate that the total disability benefit amount was increased to $14,180 subject to an automatic increase of $680 provided in the Policy. See Def. Ex. 1, ML 5; Trial Transcript, September 19, 2006. Berenguer was 60 years old as of December 8, 2004, the date on which he claims to have been disabled.

[4]Elimination Period is defined as "the number of days, beginning with the day Your Period of Disability starts, for which no Disability Benefits are provided." Def. Ex. 1, ML 6. The Total Disability Benefit requires that the insured be totally disabled for the entire Elimination Period. Id.

requirement if We receive written proof acceptable to Us that
further Physician's Care would be of no benefit to You.

Following the Elimination Period, Residual Disability means that due
to the continuation of that Injury or Sickness:

a)  Your Current Monthly Income is 80% or less of Your Prior
Monthly Income; and

b)  You are under a Physician's Care.  We will waive this requirement
if We receive written proof acceptable to Us that further
Physician's Care would be of no benefit to You.

Id. ML 23.  The Policy provides lifetime residual disability coverage, which is payable

according to the following equation, proportionate to the full monthly benefit of $14,180: Loss

of earnings / Prior Monthly Income X Total Disability Monthly Benefit.  Id. ML 23.

The Policy defines "Occupation" as "the occupation (or occupations, if more than one) in which

You are engaged at the start of Your disability."  Id. ML 6.  It defines "Physician's Care" as

"treatment by a Physician which is appropriate for the condition causing the disability and is

consistent with prevailing medical standards."  Id.

**B.    Berenguer's Claim**

On January 3, 2005, Berenguer submitted a written claim to Lincoln National seeking

total disability benefits under the Policy due to traumatic trapeziometacarpal arthritis of the right

thumb.  Id. ML 282, 286.  In his claim form, Berenguer wrote that because of an "April

2000/injury to right thumb during exercise/occurred in exercise facility in Norfolk, Va.," he was

"unable to use right hand safely in performance of duties and activities" except those involving a

computer.  Id. ML 282, 285.  Berenguer is left-handed.  However, he testified to having suffered

a burn injury to his left hand as a child which left a scar on the left index finger and that, as a

6

result, "I tended to use my left hand a little bit less." Berenguer Test., Sept. 20, 2006. He used his right hand to do certain tasks that left-handed persons might do with their left hand, such as shooting a pistol and swinging a golf club. Id.

In a July 22, 2005, letter, MetLife informed Berenguer that it was denying his claim for total disability benefits. Def. Ex. 1, ML 1090. MetLife explained that while it was satisfied that Berenguer's problems with his right thumb precluded him from performing gynecological surgical procedures and obstetrical procedures, it felt that he was "fully capable" of performing the duties associated with an "office-based gynecological practice," including but not limited to pelvic examinations and Pap smears. Id. ML 1090-91. Moreover, MetLife added, "We believe you are fully capable of inserting a speculum with your dominant left hand." Id. ML 1091. A speculum is as an "instrument that exposes the interior of a passage or cavity of the body by enlarging the opening." Dorland's Illustrated Medical Dictionary, 1731 (30th ed. 2003). MetLife stated that because it found Berenguer was capable of performing "one or more" of the "substantial and material duties of your occupation," it would evaluate his claim under the Residual Disability definition in the Policy. Def. Ex. 1, ML 1091. MetLife concluded that, based upon its review of occupational information that Berenguer had provided, Berenguer was capable of performing services that accounted for seventy percent of the charges for obstetrical and gynecological services that his office performed during the twelve months that preceded his claim, and was incapable of performing the remaining thirty percent. Id. Consequently, MetLife decided to pay Berenguer Disability benefits in the amount of thirty percent of the Total Disability benefit. Id. ML 1092. Berenguer appealed the decision; on December 7, 2005, Lincoln National denied the appeal. Id. ML 1239-1241.

Berenguer contends that MetLife's data actually shows that he is precluded from performing a greater percentage of his occupational duties, and that MetLife erroneously included services which Berenguer did not or would not perform himself.  Berenguer Test., September 21, 22, 2006.  Berenguer introduced into evidence a spreadsheet, Plaintiff's Exhibit 96, in order to buttress this testimony; the Court **FINDS**, however, that the spreadsheet and the testimony relying upon it were not persuasive.  However, the Court **FINDS** as a fact that Berenguer is only precluded from performing thirty percent of the total charges of his practice. The Court also **FINDS** that MetLife's denial of Berenguer's total disability claim resulted from what appeared to be a reasonable and analytically sound review that lasted approximately six months.  Several consulting physicians examined Berenguer's medical records and production data: Dr. John Rowley, an orthopedist; Dr. James Von Thron, an obstetrician-gynecologist, and Dr. Clayton Hauser, a family practitioner.  Edwin Warner, a financial consultant for MetLife, examined the effect of Berenguer's disability on his practice based on Berenguer's production data, tax returns, and a list of services billed by his practice.  Def. Ex. 1, ML 976, 1058-1064, 1077-78.  Mr. Warner examined Berenguer's production during the period from July 2003 and December 2004 based upon his practice's units and total charges, broken down by "CPT code." Id. ML 1077.  Berenguer did not help matters by failing to comply with MetLife's request for monthly collections by "CPT code."  He did not have that information because in January 2005 he destroyed the office computer hardware on which it was recorded.  Pl. Ex. 226, ML 891; Def. Ex. 1, ML 1091; Berenguer Test., Sept. 20 and 22, 2006.  The Court **FINDS** that the figures provided by Mr. Warner in MetLife's claim file were appropriate and proper.

The witnesses for Berenguer were all longtime acquaintances of Berenguer.  Dr.

Gwathmey, a board-certified orthopedic surgeon, has worked at the Hand Center since 1982 treating conditions affecting the hand, including arthritis, and practicing orthopedic surgery. Gwathmey Test., Sept. 25, 2006.  Dr. Gwathmey and Berenguer worked in the same building during the period relevant to this case, practiced in the same operating room, and would often see each other in the doctors' dressing lounge.  Id.  The two men live in "basically the same neighborhood."  Id.  Their kids used to play together and the two men attended parties together. Id.  They belong to the same country club.  Id.  Berenguer called Dr. Charles A. Wilkes, who practices general obstetrics and gynecology at Sentara Leigh Hospital.  See Pl. Ex. 92.  Dr. Wilkes has known Berenguer since 1980, when Dr. Wilkes was training at Eastern Virginia Medical School.  Wilkes Test., Sept. 22, 2006.  Around that time, Dr. Wilkes assisted Berenguer in conducting surgeries at DePaul Hospital.  Id.  Later, Berenguer and Dr. Wilkes had lockers next to each other in the labor and delivery suite and Dr. Wilkes encountered him informally over the years.  Id.  Berenguer also called Dr. Michael A. LePore, Jr., to testify as an expert witness.  LePore Test., Sept. 25, 2006.  Dr. LePore, a solo practitioner offering obstetrical and gynecological care in Suffolk, Virginia, has known Berenguer for twenty to twenty-five years. Id.  Berenguer referred patients to Drs. LePore and Wilkes when he closed his practice.  Id.; Wilkes Test., Sept. 22, 2006.  Berenguer also called Monique Rivera-Helms, a claims manager at MetLife who handled Berenguer's claim.

Defendant called Dr. Thomas R. Hunt III, Director of the Division of Orthopedic Surgery at the University of Alabama at Birmingham, to testify about the cause of Berenguer's arthritis. Defendant also called as witnesses Dr. Catherine A. Matthews, an Assistant Professor in the Division of Urogynecology in the Department of Obstetrics & Gynecology at Virginia

Commonwealth University Medical Center in Richmond, Virginia, and Dr. John Wilson Schmitt,

an Associate Professor of Clinical Obstetrics and Gynecology, Director of the Division of

Obstetrics and Gynecology, and Vice Chair of Clinical Affairs at the University of Virginia.

Def. Ex. 38, 40.   The Court finds the testimony of Dr. Matthews particularly persuasive.

### C.   Berenguer's Occupational Duties

Berenguer was the sole owner and only physician in Women's Health Care of Tidewater,

a corporation. Def. Ex. 1, ML 1014.  His practice included a relatively small amount of

obstetrics, the branch of surgery which deals with the management of pregnancy and delivery of

babies, and a substantial amount of gynecology, the branch of medicine dealing with diseases of

the genital tract in women.  See Dorland's Illustrated Medical Dictionary, 1298 (30th ed. 2003).

He also treated obesity, high cholesterol, and osteoporosis, and conducted in-house laboratory

tests.  Berenguer Test., Sept. 20, 2006.  Berenguer typically examined an average of seventeen or

eighteen patients daily, ninety percent of whom received purely gynecological examinations.

Berenguer Test., Sept. 20, 2006.  His practice derived a substantial amount of revenue from in-

house laboratory testing.  For example, from July 2003 to December 2004, twenty-nine percent

of the units of service he provided were devoted to gynecology, three percent to obstetrics, and

sixty-eight percent to laboratory testing.  Def. Ex. 1, ML 976.  The Court **FINDS** as a fact that,

based on his practice's gross charges for that eighteen-month period, sixty-seven percent of its

income was generated from gynecology, ten percent from obstetrics, and twenty-one percent

from laboratory testing.  Id.  Based on this evidence, the Court **FINDS** as a fact that Berenguer's

substantial and material duties included obstetrical duties such as delivering babies,

gynecological surgery, laparoscopies,[5] cauterizations, and in-office examinations using a speculum, as well as non-OB/GYN services which he routinely offered such as in-house laboratory testing, mammography and bone density testing, referrals to specialists, and treatment of patients for obesity, hyperlipidemia (high cholesterol), and hypertension.  Def. Ex. 27, 678; Berenguer Test., Sept. 20, 2006.[6]

### D.      Cause of Berenguer's Arthritis

In his claim, Berenguer attributed his arthritis to an injury that occurred while lifting weights at a fitness facility in Norfolk in approximately April 2000.  Def. Ex. 1, ML 282, 285. Berenguer was attempting to lift 215 pounds in an exercise called a bench press, in which he lies horizontally on a bench and lifts a bar carrying weights on the ends off its holder and repeatedly presses it out from his chest.  Berenguer Test., Sept. 20 and 22, 2006.  As he prepared to lower the bar to the holder, the bar "rolled off my hands, hyperextended my thumbs, and fell onto my chest."  Berenguer Test., Sept. 20, 2006.  Although his "spotter" was present at the time, Berenguer did not call the spotter or any other witness to testify about the incident.  There appears to be no other evidence concerning the incident.

The parties' experts offered contradictory testimony as to whether Berenguer's arthritis was attributable to a degenerative process or to trauma, i.e. the weightlifting incident.  Causation is not an issue before the Court, however, as it was not among the triable issues of fact

---

[5]Examination of the interior of the abdomen by means of a laparoscope. Dorland's Illustrated Medical Dictionary, 1731 (30th ed. 2003).

[6]In making this finding, the Court does not question MetLife's decision, based upon the findings of Mr. Warner and Drs. Von Thron and Hauser, to exclude certain services that Berenguer did not or would not perform himself.  Def. Ex. 1, ML 1057, 1077-78.

designated and submitted by either of the parties in the Final Pretrial Order entered September 8, 2006.[7]  Moreover, MetLife conceded that Berenguer was partially disabled and, during its review of his claim for total disability, it did not investigate the weightlifting incident or raise questions about whether his arthritis arose from anything other than that incident.  Rivera-Helms Test., Sept. 21, 2006.

Although it is unnecessary for the Court to make a finding as to whether the arthritis was degenerative or trauma-induced, the Court will briefly consider the evidence on the issue since considerable time was spent on this.  Both parties' orthopedic physicians, Drs. Hunt and

---

[7]The Final Pretrial Order states that the Plaintiff's triable issues on his breach of contract and declaratory relief claims are: (a) Is Dr. Berenguer "totally disabled" under the terms of the Policy?; (b) If Dr. Berenguer is only "partially disabled," as MetLife claims, what is the extent of his partial disability?; (c) What benefits does MetLife owe Dr. Berenguer under the Policy?; (d) What damages has Dr. Berenguer suffered as a result of MetLife's breach of contract?

The Plaintiff's triable issues on its bad faith claim were designated as: (a) Did MetLife deny Dr. Berenguer's claim for total disability without making a reasonable, good faith investigation of the facts and circumstances underlying the claim?; (b) Was it reasonable for MetLife to reach the conclusion that Dr. Berenguer was only partially disabled without first obtaining Dr. Berenguer's X-rays, grip/strength testing or an IME, all as requested by Dr. Rowley, or advising him about the medical history of Dr. Berenguer's left hand?; (c) Was it reasonable for MetLife to reach the conclusion that Dr. Berenguer was physically capable of using a speculum with his left hand without providing all of Dr. Berenguer's occupational information to Dr. Von Thron, or providing him with any information about the medical history of Dr. Berenguer's left hand?; (d) Was it reasonable for MetLife to reach the conclusion that obstetrics and gynecological surgery constituted only thirty percent of Dr. Berenguer's practice without first verifying the analysis of Mr. Warner?; (e) What costs did Dr. Berenguer incur as a result of MetLife's conduct, including reasonable attorney fees?

The Defendant's triable issues were: (1) Whether under Count I of the Complaint Plaintiff is not entitled to a declaratory judgment that he qualifies for Total Disability benefits under the Policy; (2) Whether Defendant properly determined that Plaintiff is residually disabled under the terms of the Policy, and not totally disabled, and therefore did not commit a breach of contract, as alleged in Count II of Plaintiff's Complaint; (3) Whether Defendant's denial of Plaintiff's claim for Total Disability benefits was not in bad faith pursuant to Va. Code § 38.2-209(A), as alleged in Count III of Plaintiff's complaint.  See Doc. No. 57, 54.

Gwathmey, agreed that Berenguer has basilar thumb arthritis, or unilateral basilar thumb arthritis, "a very common" arthritic condition affecting the joint located next to the wrist and between the thumb metacarpal and the bone.  Hunt Test., Sept. 26, 2006.  Basilar thumb arthritis commonly arises from repeated motions such as gripping and pinching.  Id.  According to Dr. Gwathmey's notes of October 28, 2003, an X-ray of Berenguer's right hand "reveal[ed] subluxation of the joint and a loose body, perhaps an avulsion fracture, at the trapeziometacarpal joint."  Pl. Ex. 69, TJB00310 (emphasis added).  His notes added, "Impression: Trapeziometacarpal arthritis secondary to trauma."  At trial, Dr. Gwathmey examined the X-ray again (Pl. Ex. 95) and testified that it shows a "loose body"—a piece of bone "not attached to anything"—which "may be an avulsion fracture."  Gwathmey Test., Sept. 25, 2006.  Dr. Hunt testified, however, that it was "highly unlikely" that Berenguer's arthritis was trauma-induced. Rather, upon examining Berenguer's X-ray during trial, he concluded that it appeared "highly degenerative" in nature.  Hunt Test., Sept. 26, 2006.  Moreover, Dr. Gwathmey wrote in his April 30, 2003, notes that a "grind test" of Berenguer's thumb was "indicative of degenerative arthritis."  Pl. Ex. 69, TJB00311 (emphasis added).  Dr. Gwathmey admitted that he could not tell from the X-ray whether the arthritis was due to trauma or from the aging process. Gwathmey Test., Sept. 25, 2006.

Both parties' orthopedic experts agree, however, and the Court **FINDS** as a fact, that basilar thumb arthritis can be effectively treated with surgery, the most common procedure being an arthroplasty, which involves surgically removing part or all of the rectangular bone beneath the thumb metacarpal bone and replacing it with other tissues harvested from the wrist or elsewhere.  Hunt Test., Sept. 26, 2006; Gwathmey Test., Sept. 25, 2006.  The Court **FINDS** as a

fact that such a procedure is known to provide pain relief in ninety to ninety-five percent of patients who receive it within three months of surgery, and in the remaining ten percent of patients within four to six months.  Gwathmey Test., Sept. 25, 2006; Hunt Test., Sept. 26, 2006. Berenguer rejected the idea of surgery because of the risks involved and the concern that perhaps the three-month recovery would disrupt his practice.  Berenguer Test., Sept. 20, 2006; Gwathmey Test., Sept. 25, 2006.  Although Dr. Gwathmey did not recommend surgery, he did write in his notes of March 29, 2004, that "[i]t is probably a matter of time before this needs to get fixed surgically."  Pl. Ex. 69, TJB00309.  He also testified that he was unaware of any reason why Berenguer could not undergo surgery to the thumb.  Gwathmey Test., Sept. 25, 2006.  The Court finds it odd that a surgeon would refuse treatment that succeeds ninety to ninety-five percent of the time.  Whether he should have undergone surgery is not an issue in this case, however, according to the parties' pretrial submissions.  Morever, nothing in the Policy required Berenguer to undergo surgery.  Dr. Gwathmey indicated that even though Berenguer "would appear to be in excellent physical shape, he has had problems," namely "artery problems," and that the patient must assess the risks of surgery.  Id.  MetLife never told him that he must have surgery, which indicated that they waived any such requirement, if in fact there was one.  The Court rejects the defendant's argument that the possibility of surgery to treat Berenguer's arthritis is relevant to determining whether Dr. Gwathmey's treatment was "appropriate" as required by the Policy.  See Heller v. The Equitable Life Assurance Soc'y of the United States, 833 F.2d 1253, 1256 (7th Cir. 1987) (holding that a disability policy requiring that claimant be "under the regular care and attendance of a physician" does not require the insured to submit to surgery in order to receive benefits).

14

###### E.   Dr. Gwathmey's Treatment

Although he experienced soreness following the weightlifting incident, Berenguer did not seek medical treatment for his right thumb until approximately two years later, in about 2002, after noticing a "clicking sensation" in his right thumb which "progressed [and] became more prominent" over time and brought pain and swelling with it.  Berenguer Test., Sept. 20, 2006.  For two years before that, he "self-treated" using samples of prescription anti-inflammatory pain medication.  Id.

In late 2002, Berenguer approached Dr. Gwathmey for treatment.  There is not a single medical record documenting the condition of Berenguer's thumb from the April 2000 weightlifting incident until April 30, 2003, when Dr. Gwathmey first recorded notes of Berenguer's thumb condition.  Further muddying the factual record, during this same period, Berenguer repeatedly consulted Dr. Gwathmey about his elbow, which was causing him pain due to his weightlifting.  Gwathmey Test., Sept. 25, 2006.  Dr. Gwathmey described the informal consultations as follows:

> [H]e would always tell me what his complaints and ailments were, and mostly it was from lifting weights, and I say, "Well, why don't you stop lifting weights and maybe it will go away?" And, you know, he never stopped lifting weights and kept on complaining.  And eventually he would come down to the office with a complaint, and . . . he'd drop in.  And so I saw him for, I don't know, a year or two, maybe three years intermittently once a year, something like that.  And on occasion I may have given him an injection.  Never really kept notes because that's like colleagues, we see each other, we're just sort of trading things.  And after a while, I said, you know, "We've got to make a chart, this is—we can't keep going this way." So April the thirtieth we actually started a chart and the written record proceeds following that.

Id. (emphasis added).  Dr. Gwathmey's testimony that "I may have given him an injection" was made during direct examination about Berenguer's thumb and therefore implied

that it was the thumb that he injected "on occasion" prior to April 2003.  Yet Gwathmey wrote in

his notes after Berenguer's first documented visit in April 30, 2003, "We have injected the right

<u>elbow</u> in the past" (emphasis added).  Dr. Gwathmey's notes do not indicate any prior injections

other than for the elbow.  The notes further state:

> Today on examination he has a very positive grind test at the base of the right thumb,
> indicative of degenerative arthritis.  He has pain over the right lateral epicondyle
> accentuated by resisted wrist extension.  I did not x-ray the hand today.  The arthritis is
> quite obvious.  We put him on a trial of Naprosyn for the thumb and injected the right
> lateral epicondyle.  We will see him again when he as further problems with this.

Def. Ex. 1, ML 821.  The evidence is clear that in April 2003 Berenguer received an

injection in his "lateral epicodyle" (tennis elbow)—but not his thumb—and that prior injections

were to the elbow and not the thumb.  Def. Ex. 1, ML 821; <u>see</u> Berenguer Test., Sept. 20, 2006

("I had been seeing Dr. Gwathmey for some joint-related complaints involving my elbow [prior

to April 2003]").  Dr. Gwathmey's notes totally reject the implication that he tried to make at

trial concerning the timing of Berenguer's injections of his thumb.  Dr. Gwathmey's notes show

that he treated Berenguer's elbows on August 11, 2003, and September 5, 2003, and neither visit

involved any treatment of the thumb.  Def. Ex. 1, ML 821.[8]   In fact, the first time that he

---

[8]The August 11, 2003, records state, in their entirety:

Dr. Berenguer pulled his left lateral epicondylar area about a month ago while lifting
weights.  He tried Celebrex, but that did not provide much relief.  Today on examination
he has pain over the left lateral epicondyle.  I injected that today.  We will see him again
when he has further problems.

Def. Ex. 1, ML 821.  Dr. Gwathmey's notes of September 5, 2003, state, in whole:

Dr. Berenguer did not get much relief with his last injection.  He still has pain over the
lateral epicondyle.  I injected him again today.

injected Berenguer's thumb, according to his notes, was October 28, 2003.  Id. ML 822.

Berenguer implied otherwise when he testified, "I believe the first time he injected my thumb to

give me relief was in August of '03."  Berenguer Test., Sept. 20, 2006.  The Court **FINDS** as a

fact that, prior to April 30, 2003, Berenguer did not receive any injections for the thumb but only

for the elbow and that the injections of April 30, 2003; August 11, 2003; and September 5, 2003,

were for either one or both of the elbows.

      At some point, Berenguer began to complain about his "grip strength, the ability to grip

things, and also in the ability to pinch, in the sense of being able to screw things down, to grip

something and turn it."  Berenguer, Test., Sept. 22, 2006.  By "pinch," he meant "the ability to

grab something between my thumb and, typically, index finger and hold it—or exert pressure."

Id.  On several occasions, beginning on October 28, 2003, Berenguer complained to Dr.

Gwathmey about his difficulty using a speculum in female examinations.  Def. Ex. 1, ML 822.

By approximately November 2004, Berenguer's thumb was bothering him such that he began

refusing certain patients and stopped performing certain surgeries.  Berenguer Test., Sept. 20,

2006.  On December 9, 2004, Berenguer told his patients he was closing his practice and began

referring patients to other doctors.  Id.; Def. Ex. 1, ML 708.  Dr. Gwathmey told Berenguer it

was "unrealistic" for him to continue his practice because "he has a condition that precludes

pinching and holding instruments for any period of time . . . .  The hand is not going to improve

over time.  In fact, it will deteriorate."  Def. Ex. 1, ML 824.  As he later put it, Berenguer had

problems "after sustained gripping or pinching because of the force across the

trapeziometacarpal joint. . . .  Chuck pinch and key pinch are the most problematic, particularly

when a sustained force has to be applied, such as holding a forceps or applying pressure on the

lever of the speculum, or simply applying pressure with that thumb, either in the office or in the operating room . . .   General daily activities are possible and do not preclude his normal activities of daily living or recreation.  It is the constant pressure required in his surgical practice that is most problematic for him." Id.

Berenguer cited two occasions in early December 2004 in which his arthritic thumb allegedly disrupted surgical operations, in one case leading to him to inadvertently cut the wall of a patient's colon during a hysterectomy.  Berenguer Test., Sept. 20, 2006; Def. Ex. 36, SLH 72.  His records of the operation make no mention of his right hand, however, and he told no one at the hospital of the complication.  Berenguer Test., Sept. 22, 2006.  In addition, the same day of this mishap, December 8, 2004, Berenguer used a speculum in an in-office pelvic examination and performed a vaginal hysterectomy in which he used his right hand to do "a great number of things," including clamping—which "involve[d] pinching and gripping functions of my right hand"—cutting, and dissecting with his fingers.  Def. Ex. 36, SLH 99, 102-04; Berenguer Test., Sept. 22, 2006.  Asked on cross-examination whether pinching and gripping were tasks which Berenguer cannot do, Berenguer clarified that they were "all of the things I ever had difficulty doing . . . I can't do them now most of the time.  I can't do them with . . . any reliability." Id. (emphasis added).  The Court finds it significant that on the same day that he decided to retire because of his right hand, he used that hand to cut and dissect, pinch and grip—the motions which Berenguer alleges he cannot do.  In addition, the Court finds particularly illuminating Berenguer's qualification that he was able to pinch and grip—just not "with any reliability."

### F.    Berenguer's Use of His Right Hand to Lift Weights

Despite the alleged pain in his thumb, Berenguer is capable of engaging in various tasks

with his right hand and thumb.  He drives a standard-gear automobile, operating the stick shift with the heel of his right hand.  Berenguer Test., Sept. 20, 2006.  He is "absolutely" able to hold a pen between his right-hand thumb and index finger.  Berenguer Test., Sept. 22, 2006.  At trial, he demonstrated that he was able, albeit with "great difficulty," to put his right thumb against the palm of his right hand.  Id.  He was able to "slowly" pinch his right thumb and right pinkie finger together, as well as his right thumb and right ring finger.  Id.  He is able to hold a heavy briefcase in his right hand.  Id.

In addition, Berenguer has continued to lift weights, including gripping and lifting dumbbells with his right hand, though with the assistance of straps.  Id.  He does exercises such as inclined bench presses using a machine, and a variety of one-handed exercises using dumbbells, including "curl" exercises which involve gripping a dumbbell with his right hand and moving it up and down toward his chest.  Id.  He also does a "military press," which involves a "straight push" of the dumbbells while sitting on a bench, and a "lateral dumbbell exercise," in which he lifts the dumbbells "up while sitting and standing."  Id.  In the standing lateral exercise, he holds dumbbells weighing between twenty-five and thirty-five pounds each in each hand at his side.  Id.  Asked whether he had to "wrap" his fingers around the bar, he testified, "absolutely."  Id.  Then he lifts the dumbbells "away from my body at the same time."  Id.  At some point during the exercise he would have twenty-five pounds resting on the base of his thumb.  Id.

> Question:   But yes or no? At some point you've got twenty-five pounds resting on the base of your thumb?
>
> Answer:   I suspect that's correct, that at some point in the motion of the exercise the thumb is the object of more pressure than in other parts of the exercise, sure.

19

Question:     All right.  Okay. And that doesn't hurt?

Answer:       It doesn't hurt because I wear the straps. . . .  I've adapted to my inability to grip those dumbbells otherwise.

Id.  The Court finds that Berenguer's ability to grip and lift twenty-five pound dumbbells casts significant doubt on his testimony that he cannot perform the duties of an office-based OB/GYN physician, including using a speculum with his right hand.

### G.     Berenguer's Left Hand

Berenguer argues that MetLife, in denying him total disability benefits, failed to take into account that he had problems in his left hand as well.  He testified that his left hand was "not able to assume or compensate" for the "loss of function" in his right hand as a healthy left hand would due to a "contracture" on his left index finger left from a childhood burn injury. Pl. Ex. 132, ML 87-88, ML 94, ML 96, ML 98, ML 102; Berenguer Test., Sept. 22, 2006.  He testified that he had a "weaker grip in my left hand because my index finger cannot grab around items that my right hand can or that my left hand would normally or my other fingers can."  Id.  At no time did Berenguer represent to MetLife that his left hand was impaired, however.  Berenguer Test., Sept. 20, 2006.  In his application for the Policy in 1994, he wrote that in 1975 he underwent a Z-plasty surgery to correct an "old burn scar" on his left hand and that he had "no problems since."  Def. Ex. 1, ML 16.  Berenguer confirmed at trial that he had no problems pinching with his left-hand thumb and left index finger. The account of the left hand is a distraction from the real issues in this case.  The Court **FINDS** as a fact that Berenguer's left hand is functional and has no disability.

20

### H.      Berenguer's Ability to Use a Speculum

The most important issue in this case is whether Berenguer is capable of using a speculum to perform physical examinations on patients, as it relates directly to whether, as MetLife concluded, he is capable of maintaining an office-based gynecological practice.   The typical speculum used in many OB/GYN practices is made of metal and consists of two adjustable blades, which, when inserted and widened inside the patient allow the physician to "visualize" the upper part of the vagina and the cervix.  LePore Test., Sept. 25, 2006; Matthews Test., Sept. 27, 2006.  Pelvic examinations require a speculum "almost one hundred percent of the time."  Berenguer Test., Sept. 20, 2006.  Berenguer used a speculum "eighty to one hundred times a week" in "ninety-plus percent" of the examinations he did in the office.  Id.  Berenguer found it necessary to use a speculum for in-office procedures such as Pap smears; IUD placement and removal; taking tissue samples from the uterus; evaluating abnormal pap smears using a test called a colposcopy;[9] taking samples from the vaginal tissues, and removing abnormal growths such as moles from the vaginal area.  Id.  "[A]lmost all" of the twelve procedures listed as "Office Surgery" on Berenguer's list of the services that Women's Health Care of Tidewater offered its patients, broken down by "CPT codes"—required the use of a speculum.[10]  Id.

---

[9]A colposcopy is an "examination of the cervix and vagina by means of the colposcope." Dorland's Illustrated Medical Dictionary, 393 (30th ed. 2003).

[10]The twelve procedures are: "I&D Cyst/Abscess," "I&D Bartholin Cyst/Abscess," "I&D Abscess Vulva," "Hysterectomy," "Office D&C (98)," "Conization Cervix (90)," "Leep Vulva/Vagina," "Norplant Insertion," "Norplant Removal," "Mole Removal up to .5 cm," "Mole Removal .5 to 1.0 cm," "Mole Removal 1.0 to 2.0 cm."  Berenguer Test., Sept. 20, 2006; Def. Ex. 1., ML 427.  Berenguer testified, however, that Norplant insertion and removal did not require a speculum, and that a speculum was not necessarily required in some mole removal and

Four speculums were admitted into evidence: a right-handed metal speculum (Court Ex. 1), a left-handed metal speculum (Court Ex. 3), and two plastic speculums (Court Ex. 4, 5).[11]  A left-handed speculum is identical to the right-handed speculum except the lever is on the opposite side.  Matthews Test., Sept. 26, 2006.  Court Exhibit 1 has two locking devices on it, one near the top of the speculum, and one closer to the bottom.  The top locking device consists of a nut on the end of a bolt that, when turned clockwise and tightened, prevents the speculum blades from closing.  Berenguer Test., Sept. 22, 2006.  The bottom locking device also consists of a screw on the end of a bolt which, when adjusted, separates the blades from one another for additional exposure.  Id.

Prior to the onset of his arthritis, Berenguer would insert and open the speculum with his right hand.  Berenguer Test., Sept. 21 and 22, 2006.  Sometimes, but not every time, he would use his left hand to "screw down" the top locking device to allow greater visibility inside the patient.  Berenguer Test., Sept. 21, 2006.

Berenguer cited several problems in using the speculum with his right hand caused by his arthritic thumb.  First, he contends that opening the speculum required varying amounts of pressure due to "resistance" from the patient's "body tissues."  Berenguer Test., Sept. 20, 2006. The pressure needed to open the blades is "significantly greater" in cases of patients who are heavier or younger, he testified.  Id.  As his arthritis worsened, Berenguer began using his left thumb to "push my right thumb to get the lever open."  Id.  Berenguer did not testify that he

---

abscess procedures.  Berenguer Test., September 19, 2006.

[11]The Court will not consider Court Exhibit 5, which Plaintiff introduced during its cross-examination of Dr. Matthews because Dr. Matthews testified that it was "broken."  Matthews Test., Sept. 27, 2006.

experienced problems opening the speculum every time.  As he testified, "I didn't have the

strength to push the blades open . . . reliably."  Berenguer Test., Sept. 22, 2006.  Second, once

the speculum was open, he "could not hold" it open in order to screw down the locking device

with his left hand.  Instead, he "adapted by pushing the heel of my right hand up against the lever

to hold it so that I could lock down the device to hold it open . . . so that I could complete the

procedure."  Id.  After taking the sample—which he did with his left hand—he would remove

the speculum by using the heel of his right hand to "release the pressure" on the blades so that he

could unscrew the locking device.  Id.  Berenguer suggested that using the heel of his hand was

not a safe alternative.  "[M]ore than once," he testified, "the edge of the lever of the speculum

slipped off the heel of my hand when I was attempting to open it and snapped the blades of the

speculum closed," on one occasion causing a patient "significant pain."  Id.  Third, in situations

in which he did <u>not</u> lock the speculum, he had to apply "constantly shifting" pressure in order to

maneuver it inside the patient.  He testified:

> [W]hen I insert the speculum, I have to maneuver the instrument around inside the body
> cavity in order to visualize what I need to see in order to take a specimen . . . .  That
> movement of the instrument is done without it being in the locked position.  I can't lock
> it, because once I lock it, it's rigid and it won't change.  Therefore, if I move it the wrong
> way it causes pain for a given patient.  So I have to be constantly shifting the pressure,
> changing the pressure that I'm applying to the instrument in order to accommodate
> whatever resistance I'm experiencing from the patient's muscle tone, or from the
> patient's sensitivity, or her reaction to the examination itself.  So there is a period of time
> during the insertion and maneuvering and placement of the speculum where I have to
> hold the pressure on the lever in order to accomplish that goal.

Berenguer Test., Sept. 21, 2006.

The expert testimony of the parties' OB/GYN expert witnesses casts doubt on

Berenguer's claims about his difficulties inserting, opening, and manipulating the speculum.  Dr.

LePore demonstrated that he knew little about Berenguer's use of a speculum and did not know whether it was possible to conduct a pelvic examination with arthritis in one hand. Given these deficiencies, and given Dr. LePore's personal ties to Berenguer, the Court finds Dr. LePore's testimony to be less than credible and accords it little weight.

Drs. LePore and Wilkes testified that, in their opinions, using a speculum in a pelvic examination required "two fully functional hands." LePore Test., Sept. 25, 2006; Wilkes Test., Sept. 22, 2006. According to Dr. Wilkes, without two "fully functional" hands "you could easily hurt the patient," and "you need both hands" to handle an "unexpected complication" such as bleeding. Id. Lincoln National's two expert OB/GYN witnesses strongly disagreed that a speculum requires two fully functional hands. Drs. Matthews and Schmitt demonstrated, using Court Exhibit 1, how a speculum could be used with one hand. Dr. Matthews, who operates a speculum with one hand in her practice, asserted that it can "easily be manipulated" with one hand. Matthews Test., Sept. 27, 2006. In Dr. Matthews' opinion, Berenguer should be capable of using his left hand to insert and manipulate either a right-handed and a left-handed speculum, as well as a plastic speculum. Id. The Court accepts the testimony of Dr. Matthews and rejects the testimony of Drs. Wilkes and LePore. It **FINDS** as a fact that a speculum may be operated for all purposes with one hand.

Contrary to Berenguer's concerns about resistance from the patient necessitating "constantly shifting the pressure" with the hand in opening and manipulating the speculum, Dr. Matthews testified there is not a "massive amount of resistance." Id. As Dr. Matthews testified, inserting and opening a speculum is a "straightforward and simple procedure" lasting about "fifteen seconds" and "does not require sustained gripping or any tremendous force." Id. A Pap

24

smear—which involves taking a sample from the cervix—"doesn't require any major gripping or difficult manipulating." Matthews Test., Sept. 26, 2006. Each OB/GYN who testified agreed that a Pap smear is ordinarily a very swift procedure. See Berenguer Test., Sept. 22, 2006 (anywhere from ten seconds to twenty-five seconds); Wilkes Test., Sept. 22, 2006 ("as little as a minute" and as long as fifteen minutes); Matthews Test., Sept. 27, 2006 ("about five seconds to collect a Pap smear"). Only if the patient is "really enormously, hugely obese" would it be necessary to apply "a little bit more power." Id. Dr. Schmitt proved this point when, using a model female torso that he uses for teaching medical students, he demonstrated in open court how he could insert and lock a speculum in a matter of seconds. Speculums do not "pop out" of patients and it is common to leave the speculum in place and untouched during the procedure, leaving both hands free to "actually do the procedure" and address any complication. Id. Using Court Exhibit 1 to demonstrate to the Court, both Drs. Matthews and Schmitt testified that the top locking device could be swiftly and easily spun tight with a single finger. See id. (locking the top screw can be done with a single finger on either hand "without having to pinch anything"); Schmitt Test., Sept. 27, 2006 ("You just spin it."). Dr. Schmitt's demonstration showed that whatever pressure is applied with the thumb to keep the speculum open while the screw is turned lasts for a matter of seconds. After the top lock is turned "it just sits there," freeing the physician to take samples with his dominant hand. Schmitt Test., Sept. 27, 2006. Dr. Matthews testified that the bottom locking device does require use of two hands—"one hand to stabilize the speculum, and the other hand to untighten the screw"— but that the bottom locking device "is not commonly used" during pelvic examinations because the speculum usually allows one to visualize the cervix without it. Matthews Test., Sept. 27, 2006. It is "very, very rare" that

25

Dr. Matthews manipulates the bottom lock in part because it is "uncomfortable" for the patient.

Id.

Notwithstanding Berenguer's concern about speculums "snapp[ing]" closed and injuring patients, there is little risk of injury during a typical in-office examinations such as a Pap smear. Id. A speculum is a "blunt instrument" and "can't cut tissue." Id. Unlike surgery, office-based procedures such as Pap smears do not result in extensive bleeding. Id. Although in Dr. Schmitt's opinion it would require two hands to address "excessive bleeding," it would not "necessarily require you to have sustained pinching or pincer grip with your thumb and index finger," which is precisely what Berenguer has trouble doing. Schmitt Test., Sept. 27, 2006.

The parties' experts disagreed as to whether a plastic speculum is a viable alternative to a metal speculum. The plastic speculum, Court Exhibit 4, features a "ratcheting device" that allows it to be opened in increments without the need for any screwing or unscrewing motion. Matthews Test., Sept. 27, 2006. Unlike a metal speculum, which must be sterilized to be reused, a plastic speculum is disposable. Id. Berenguer testified that he did not use plastic speculums because, he claimed, "they were bendable" and "they tended to break on occasion when excess pressure was placed on them." Berenguer Test., Sept. 20, 2006. According to Drs. Wilkes and Schmitt, plastic speculums are less flexible, have less control, may break, and are more difficult to open than the metal version. Wilkes Test., Sept. 22, 2006; Schmitt Test., Sept. 27, 2006. Dr. Matthews stated that the plastic speculum (Court Ex. 4) was used "every day" in the health department at the Virginia Commonwealth University Medical Center, and stated, "you know, we use these every day on enormously big, pregnant women to visualize their cervix on our unit. So they're completely safe." Matthews Test., Sept. 27, 2006. Dr. Matthews demonstrated that,

in "two seconds, or one second," the plastic speculum could be opened and closed with only one hand, albeit by using one's thumb—without any manipulating.  Id.  Berenguer's witness, Dr. Wilkes, conceded that "maybe" the plastic speculum could be used with one hand.  Wilkes Test., Sept. 22, 2006.

Based on the above, the Court **FINDS** that:  inserting, opening and maneuvering a speculum does not require "sustained gripping or pinching" with either hand;  the pressure placed upon the thumb when using a speculum is minimal and temporary;  the top locking device of a speculum can be tightened with a single finger of either hand and does not require two hands to manipulate;  the lower locking device need not be used except in the rare instance of an examination on an extremely obese patient;  the plastic speculum is safe and reliable and can be used with only one hand (either hand), and the plastic speculum (Court Ex. 4) is used daily in places such as the Virginia Commonwealth University Medical Center.  From these facts the Court **FINDS** as a fact that Berenguer is capable of safely inserting and manipulating a speculum using only one hand.  In the rare situation where he would need to open the speculum so wide that the bottom lock must be used, Berenguer could use his dominant left hand to hold the speculum, or, alternatively, use a plastic speculum of the type utilized by Dr. Matthews' colleagues at the Virginia Commonwealth University Medical Center, which does not require two hands.  The Court further **FINDS** as a fact that the plastic speculum used by Dr. Matthews' colleagues at the Medical Center (Court Ex. 4) is operable with one hand.  It also **FINDS** as a fact that Berenguer can insert and operate a speculum with one hand.

## I.  Berenguer's Ability to Conduct Other GYN Procedures

As to tasks that do not involve a speculum, Drs. Schmitt and Matthews rejected the

27

suggestion that "sustained gripping or pinching" is necessary in order to perform the duties of an office-based OB/GYN.   Schmitt Test., Sept. 27, 2006 (testifying that an office-based OB/GYN engages in sustained gripping or pinching "probably less than one" percent of the time).  The instruments used in office-based gynecology do not require "fine motor coordination or very delicate tissue-handling, or very delicate maneuvers."  Matthews Test., Sept. 27, 2006.  Dr. Matthews testified that she could perform Pap smears, endometrial biopsies, cervical biopsies, key punch biopsies, reinsertions and LEAP procedures, all with one hand.  Id.  In light of the testimony of each of the OB/GYNs, the Court **FINDS** that MetLife was correct in determining that Berenguer was "fully capable of performing the duties associated with an office-based gynecological practice."  See Def. Ex. 1, ML 1090.

### J.     Summary of Findings of Fact

In summary, the Court makes the following findings of fact:

1.     The substantial and material duties of Berenguer's occupation included performing obstetrical and gynecological surgery, conducting office-based gynecological examinations using a speculum, and carrying out non-OB/GYN activities such as treating patients for obesity and high cholesterol.

2.     MetLife correctly determined that Berenguer cannot perform surgery due the arthritis in his right thumb.

3.     MetLife's review of Berenguer's claim was reasonably conducted in good faith.

4.     Berenguer is capable of performing the in-office obstetrical and gynecological procedures that require use of a speculum.

5.     Berenguer's arthritis precluded him from performing services that accounted for thirty

percent of the charges of his practice as an obstetrician/gynecologist.

The Court notes that each of Berenguer's expert witnesses knew him personally for several years.  Dr. Gwathmey and Berenguer worked in the same building, were members of the same club, lived in the same neighborhood, and their kids used to play together.  In short, they are friends.  Dr. Gwathmey was very circumspect in his testimony in trying to buttress Berenguer's case.  A glaring example is Dr. Gwathmey's testimony that "I may have given him an injection" prior to his first recorded visit with Berenguer on April 30, 2003; in fact, his records show that those injections were to Berenguer's elbow, not his thumb.  The Court rejects the testimony of Dr. LePore and, frankly, does not find him credible.  It finds Dr. Matthews to be entirely credible and certainly one of the most qualified experts to appear before the Court in years.  In evaluating Berenguer's credibility, the Court rejects much of his testimony as incredible.  The Court finds it significant that in January 2005, at which time MetLife was still gathering production data from him, Berenguer destroyed the computer on which his office's monthly production information could be found.   Nothing prevented him from maintaining an office-based gynecological practice.  After carefully reviewing the evidence, the Court **FINDS** that Berenguer is not totally disabled, and that thirty percent disability is appropriate, as it has already been so determined.

## II.     CONCLUSIONS OF LAW

### A.     Breach of Contract

In a diversity case such as this, the Court must apply the substantive law of the state where the claim arose, and the federal procedural law.  See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996); Chapman v. Clarendon Nat. Ins. Co., 299 F. Supp. 2d 559, 562

(E.D. Va. 2004).  This case is governed by the law of Virginia because the insurance contract

arose in Virginia and the insured resides there.  See Pham v. Hartford Fire Ins., 419 F.3d 286,

289 (4th Cir. 2006).  A court sitting in diversity must interpret the law in accordance with the

law of the highest state court, or where the law is unclear, as it appears that the highest state

court would rule.  See Wells v. Liddy, 186 F.3d 505, 527-28 (4th Cir. 1999).

In Virginia, the elements of a breach of contract action are (1) a "legally enforceable

obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation;

and (3) injury or damage to the plaintiff caused by the breach of obligation." Ulloa v. QSP, Inc.,

271 Va. 72, 79, 624 S.E.2d 43, 48 (2006); Filak v. George, 267 Va. 612, 614, 594 S.E.2d 610,

619 (2004).[12]  An insurance policy is a contract, and as such, its terms are governed by rules of

contract interpretation.  Transcontinental Ins. Co. v. Caliber One Indem. Co., 367 F. Supp. 2d

994, 1001 (E.D. Va. 2005).  Where insurance policies are clear and unambiguous, their terms are

given their plain and ordinary meaning.  Am. Online v. St. Paul Mercury Ins. Co., 347 F.3d 89,

93 (4th Cir. 2003) (applying Virginia law); Gov't Employees Ins. Co. v. Moore, 266 Va. 155,

165, 580 S.E.2d 823, 828 (2003).  The court "must adhere to the terms of a contract of insurance

as written, if they are plain and clear and not in violation of law or inconsistent with public

policy," and it is "not our function to 'make a new contract for the parties different from that

plainly intended and thus create a liability not assumed by the insurer.'" Blue Cross and Blue

Shield of Va. v. Keller, 248 Va. 618, 626, 450 S.E.2d 136, 140 (1994) (quoting Pilot Life Ins.

---

[12]Plaintiff's view that, under Virginia law, MetLife bears the burden of proof is not
supported by either of the two cases to which Plaintiff cites.  See Johnson v. Ins. Co. of N. Am.,
232 Va. 340, 345, 350 S.E.2d 616, 619 (1986) (insurers bear the burden of proving that an
exclusion applies); Dowdle v. Nat. Life Ins. Co., 407 F.3d 967 (8th Cir. 2005) (applying
Minnesota law, not Virginia law).

<u>Co. v. Crosswhite</u>, 206 Va. 558, 561, 145 S.E.2d 143, 146 (1965)).  Because the "principal

purpose of insurance is protection" and because policies are drafted by insurers, however, "if the

language of a policy is capable of different interpretations, we will construe it in favor of

coverage or indemnity and against a limitation of coverage."  <u>Am. Online</u>, 347 F.3d at 93; <u>Hill v.

State Farm Mut. Auto. Ins. Co.</u>, 237 Va. 148, 375, S.E.2d 727, 730 (1989) (holding that any

ambiguities in coverage are to be "construed liberally in favor of the insured and strictly against

the insurer").

### 1.     Total Disability vs. Residual Disability

As an initial matter, the Court **FINDS** that, based upon Dr. Gwathmey's treatment of

Berenguer's thumb, Berenguer met the Policy's condition that he be "under a Physician's Care,"

which is defined as "treatment by a Physician which is appropriate for the condition causing the

disability and is consistent with prevailing medical standards."  Def. Ex. 1, ML 6.   In addition,

the Court need not reach the issue of whether Berenguer's disability was caused by "sickness" or

"injury" as those terms are defined in the Policy because that issue, while alluded to during trial,

was not presented to the Court in the Final Pretrial Order, nor was it argued during closing

arguments or in the post-trial Proposed Findings of Fact.  The Court notes, however, that at no

time before trial did MetLife challenge his claim that his disability was due to an "injury."  Def.

Ex. 1, ML 1090-1095; Rivera-Helms Testimony, Sept. 22, 2006.

The central legal issue is the proper construction of the terms "Total Disability" and

"Residual Disability" under the Policy.  As noted, the Policy defines "Total Disability" as the

inability, "due to Injury or Sickness," to "perform the substantial and material duties of Your

occupation."  "Residual Disability" is the inability, "due to Injury or Sickness," to "perform one

or more of the substantial and material duties of Your occupation." The Policy protects Berenguer against disability from Berenguer's own ("Your") occupation, rather than from "any" or "comparable" occupations.

The interplay between "Residual Disability" and "Total Disability" provisions such as those in the Policy is an open question under Virginia law. Courts in other jurisdictions which have confronted similar provisions have taken one of two approaches. Plaintiff urges the Court to apply cases which conclude that the definitions of "Total Disability" and "Residual Disability" are ambiguous, and further that an insured can be totally disabled despite being able to perform one or more substantial and material duties. Giddens v. The Equitable Life Assurance Soc'y of the United States, 445 F.3d 1286, 1297 (11th Cir. 2006) (holding that, under Georgia law, insured was totally disabled based upon inability to perform "most or the majority" of his substantial and material duties); Dowdle v. Nat. Life Ins. Co., 407 F.3d 967 (8th Cir. 2005).[13] Berenguer argues (1) that in order to be totally disabled he need not prove that he is

---

[13]Plaintiff calls the Court's attention to Nicoli v. Monarch Life Ins. Co., 70 Misc.2d 147, 332 N.Y.S.2d 803 (N.Y. 1972), in which the Supreme Court of New York held that a physician was totally disabled due to his inability to continue his practice in obstetrics and gynecology despite his employment as a consultant in sex education and family planning. Notwithstanding the factual similarities to this case, Nicoli involved an insurance policy which defined "total disability" as "the complete inability of the insured to engage in his regular occupation," which is substantially different from the definition at issue here. The Court finds similarly distinguishable other cases dealing with materially different definitions of "total disability." See e.g. Blasbalg v. Mass. Cas. Ins. Co., 962 F. Supp. 362 (E.D.N.Y 1997) (defined as the "substantial inability to perform the material duties of [the policyholder's] work"); McGrail v. Equitable Life Assurance Soc'y of the United States, 292 N.Y. 419, 425, 55 N.E.2d 483 (1944) (defined as inability to perform "any and every duty pertaining to his occupation"); Heald v. Aetna Life Ins. Co., 340 Mo. 1143, 104 S.W.2d 379, 380 (1937) (defined in part as inability to perform "any and every duty"); Matza v. Empire State Mut. Life Ins. Co., 50 A.D.2d 554, 554, 375 N.Y.S.2d 578, 581 (N.Y. 1975) (defined as inability to perform "each and every duty of his occupation").

unable to perform *all* of the duties of his occupation, but only the "substantial and material" duties "necessary to be reasonably expected to carry on that occupation," Pl.'s Proposed Findings of Fact and Conclusions of Law 19; (2) that the Policy is ambiguous because the definition of total disability is completely subsumed by the definition of residual disability, and therefore should be construed such that Berenguer is totally disabled, and (3) that he is totally disabled because MetLife admitted as much in conceding that he cannot performing obstetrics and gynecological surgery.

Lincoln National asks the Court to follow the line of cases holding that in order to recover total disability benefits, an insured is "obligated to show that his disability prevented him from performing all of those duties, not just some of them." McCosker v. Paul Revere Life Ins. Co., 279 F.3d 586, 588 (8th Cir. 2002) (finding this construction to be "the only one that comports with both reason and authority"). See Conway v. Paul Revere Life Ins. Co., No: 5:99CV150-T, 2002 WL 31770489, *9 (W.D.N.C. 2002), *aff'd,* 70 F. App'x. 117, 2003 WL 21730096 (4th Cir. 2003); Yahiro v. Nw. Mut. Life Ins. Co., 168 F. Supp. 2d 511 (D. Md. 2001); Dym v. Provident Life & Accident Ins. Co., 19 F. Supp. 2d 1147 (S.D. Cal. 1998). See also Giampa v. Trustmark Ins. Co., 73 F. Supp. 2d 22, 27-29 (D. Mass. 1999) (surveying cases). Lincoln National argues that Berenguer's ability to perform at least one of his substantial and material duties necessarily means that he is not unable to perform "the" substantial and material duties of his occupation—and is thus not totally disabled as the Policy defines the term.

The Court refuses to graft language onto the contract, and thus rejects Berenguer's argument that he need only show that he cannot perform the substantial and material duties "necessary to be reasonably expected to carry on that occupation." The Court recognizes that the

United States Court of Appeals for the Eighth and Eleventh Circuits have found that the phrase "unable to perform the substantial and material duties" is "susceptible to differing interpretations, because [it does] not speak in terms of 'any,' 'all,' 'some' or 'the most important part' of [the insured's] duties." Dowdle, 407 F.3d at 970. In Giddens, the Eleventh Circuit, construing definitions of "Total Disability" and "Residual Disability" similar to those here, found the Total Disability clause to be ambiguous, in part because, as in this case, it did "not identify what percentage of 'the' duties the insured must be able to perform" and that "[t]he clause does not say 'all' substantial and material duties or 'most' or any percentage." 445 F.3d at 1298. The court added, however, "We do not suggest that 'all' is an unreasonable interpretation of the policy language, but we do say that 'most' or the 'majority' of the substantial and material duties is also a reasonable interpretation *if* an insured is unable to engage in his regular occupation as a result of his inability to perform most or the majority of those duties." Id.   Lincoln National argues that the policy language is clear. It argues that in contrast to the Residual Disability clause, which uses the term "one or more," the "Total Disability" clause's use of the word "the" preceding the words "substantial and material duties" can only mean that one must be unable to perform *all* the substantial and material duties of one's occupation in order to be totally disabled. As Lincoln National's counsel put it at trial, if one were to ask a third-grade student to name "the" states of the United States, "the only way that Johnny would get a 100 on that test is to name all 50 states." Trial Tr. Sept. 27, 2006. To construe the "Total Disability" clause as applying to an insured who is able to perform "one or more" of his substantial and material duties, Lincoln National argues, would read the "Residual Disability" clause out of the contract.

34

Although the United States Court of Appeals for the Fourth Circuit has not fully addressed this issue, it did, in an unpublished per curiam opinion, affirm a district court opinion which substantially adopted Lincoln National's argument. See Conway, 70 F. App'x. 117, 2003 WL 21730096, at *1 (citing McOsker, 279 F.3d at 588).  In Conway, the Fourth Circuit affirmed the district court's finding that an insured plaintiff whose policy defined total disability as the inability "to perform the important duties of Your regular occupation" was not totally disabled. Id.  The United States District Court for the Western District of North Carolina held that to be totally disabled the claimant must show his disability "'prevented him from performing all of those duties, not just some of them,'" or else "the existence of the residual disability portion of the policy would have no meaning."  Conway, 2002 WL 31770489, at *9 (citing McOsker, 279 F.3d at 588).  The Court finds this reasoning to be persuasive and in line with what other courts have held in an effort to give meaning to the entire contract.  See McOsker, 279 F.3d at 588 ("It is evident . . . that a person who can perform some but not all of his or her important duties has a 'Residual Disability' within the meaning of the policy, and that therefore in order to be eligible for total disability payments a person would be required to show that he or she was unable to perform any of those important duties . . . .  [I]t is not otherwise possible to give effect to both parts of the contract."); Dym, 19 F. Supp. 2d at 1149-50 ("A comparison of the two definitions suggests that the phrase 'you are not able to perform the substantial and material duties of your occupation' as used in the 'total disability' definition cannot reasonably be read as 'you are not able to perform one or more of the substantial and material duties of your occupation,' because if such a reading was intended, the language 'one or more' would have been used, as it is used in the 'residual disability' definition."); Provident v. Cohen, 193 F. Supp. 2d 845, 850-51 (D. Md.

35

2002) ("When the insurance contract is considered as a whole, it is clear that where the insured 'is unable to perform one or more *but not all* of the principal duties of the regular occupation,' he is not totally disabled, but residually disabled.").

In this case, however, the Court is not required to choose among the parties' approaches. Even under the standard in Giddens, i.e., that an insured is totally disabled if he cannot perform "most or the majority" of his substantial and material duties, 445 F.3d at 1297, Berenguer would still not be totally disabled. This is because Berenguer is capable of engaging in the duties of an office-based gynecological practitioner, including the examinations that require a speculum, which, as the Court noted above, Berenguer did an average of "eighty to one hundred" times per week. Even if the Court found the policy language was ambiguous and construed it in his favor more than it must already, Berenguer would still fall far short being totally disabled.

The Court **FINDS** that, as a matter of law, Lincoln National was not in breach of contract in denying him total disability benefits and instead paying him under the Residual Disability clause. The Court **FINDS** that Berenguer was partially disabled pursuant to the "Residual Disability" clause in the Policy from performing services that accounted for thirty percent of the charges for OB/GYN services that his office performed during the twelve months that preceded his claim, and he is entitled to disability payments in accordance with this finding under the Residual Disability clause.

Finally, the Court **FINDS** that because the evidence reasonably supports a denial of total disability benefits, and because there was no evidence of bad faith on the part of MetLife, Berenguer is not entitled to attorneys' fees under Va. Code Ann. § 38.2-209(A). See Cuna Mut. Ins. Soc. v. Norman, 375 S.E.2d 724, 726 (1989).

36

The Court enters judgment for the defendant.

The Clerk of the Court is **DIRECTED** to provide a copy of this to all counsel of record.

**IT IS SO ORDERED.**

_____/s/_____

UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

November 15th_, 2006